## SHEWELL v. KEEN ET AL., EXECUTORS OF FORDE.

April 9, 1836.

### *Case stated.*

A legacy in the hands of executors is not the subject of foreign attachment for a debt due by the legatee, unless the executors have assented to the legacy, or where sufficient assets being admitted to be in the hands of the executors to pay him, the legatee, prior to the attachment, has tendered an adequate *refunding* bond.

*It seems* that under the act of the 21st of March 1772, the refunding bond can be provided by the *legatee* only, and not by a creditor of the legatee; and by the act of the 24th of February 1834, the security must be given in the orphan's court, and there only.

THIS was a case stated for the opinion of the court in the nature of a special verdict, in the words following, to wit:

[Shewell v. Keen et al.]

"Sarah Forde, late of the city of Philadelphia, widow, died, having made her last will and testament, dated the 10th of July 1830, and which was proven September 14th, 1832, whereof she constituted the defendants, Charles Keen and Aaron Kille executors (*prout* copy of said will).

"Plaintiff issued a writ of foreign attachment against John B. Forde and Standish Forde, October 1st, 1832.    December 1832, No. 207 (*prout* record of attachment and return).

"*Scire facias* issued September 26th, 1833, against the defendants, as garnishees, (*prout* the writ, return thereto and record) and interrogatories were filed and the defendants' answers made (*prout* the same).

"The administration account of the defendants was filed October 18th, 1833; referred to auditors, and subsequently settled (*prout* the same in the answers of the defendants).

"Aaron Kille, one the defendants, died on the        day of 1834.

"The question submitted for the opinion of the court is, *whether the estate, goods, rights, chattels, credits and effects, or any of them, in the hands of said defendants, under the said will of Sarah Forde, were, at the time of issuing the attachment, properly attachable.*    Judgment to be given accordingly."

The following is a copy of the will referred to in the case stated, viz. :

"Be it remembered that I, Sarah Forde, of the city of Philadelphia, widow, &c. hereby make my last will and testament in the manner following ; that is to say,

"First, I will that all my just debts and funeral expenses be duly paid and satisfied.

"*Item*, I give and bequeath to my daughter, Ann Forde, a legacy or sum of 3000 dollars.

"*Item*, all the rest, residue, reversion and remainder of my estate, real and personal, whatsoever and wheresoever, I give, devise and bequeath in the manner following, that is to say : one full, equal, undivided sixth part thereof unto my daughter Eleanor Hansell, her heirs, executors and administrators for ever. *One other sixth part thereof to my son Standish Forde, his heirs, executors and administrators for ever.* One other sixth part thereof to my daughter Margaret Smith, her heirs, executors and administrators for ever. *One other sixth part thereof to my son John Forde, his heirs, executors and administrators for ever.*

[Shewell v. Keen et al.]

One other sixth part thereof to my daughter Ann Forde, her heirs, executors and administrators for ever; and the remaining one-sixth part thereof to my executors hereinafter named, in trust, for the use of my daughter Mary Poor and her heirs.

"*Item,* I nominate and appoint my friends Charles Keen, of the county of Philadelphia, and Aaron Kille, of the city of Philadelphia, executors of this my last will and testament; and for the better division of my estate among my residuary devisees and legatees, I authorize and empower them, my said executors, to sell and dispose of my real estate, and to grant and convey the same to the purchaser or purchasers thereof, his, her or their heirs and assigns for ever, any thing hereinbefore contained to the contrary notwithstanding.

"Provided always, and it is my mind and will, that in the distribution of my estate my son Standish Forde shall be charged with a note given to the Insurance company of                indorsed and paid by me for 616 dollars, with interest from the 26th day of May 1827, and with another note given to me for 755 dollars, with interest from the date of this my will, and deducted from his part and share of and in my said estate.

"Lastly.   [A revocation of all former wills.]"

" (Dated July 10th, 1830.   Proved September 14th, 1832.   Same day executors qualified.)"

The writ of attachment was,

"Thomas Shewell *v.* Standish Forde and John B. Forde.   To December term 1832, No. 207.   Foreign attachment case.   Bail 19,000 dollars.   Exit 1st of October."

Writ indorsed—" Attach all and singular the messuages, lands, tenements and hereditaments, goods, chattels, rights, credits, effects, and estate real and personal, whatsoever, and wheresoever lying, and being in your bailiwick, of the defendants, and especially those which are devised to the said defendants by Sarah Forde, late of the city of Philadelphia deceased, widow, as appears by her last will and testament, dated July 10th, 1832, duly proved on the 14th of September, A. D. 1832, and remaining on file in the office of the register of wills at Philadelphia; and summon as garnishees Charles Keen and Aaron Kille, executors of said last will and testament, or any other person or persons in whose hands the same you shall find."

Return of sheriff to this writ.  " October 1st, 1832, Attached as within commanded all and singular the lands, messuages and tenements of the defendants in the county of Philadelphia, and left a copy of attachment at the office of the recorder of deeds for the city

and county of Philadelphia, and further attached all the goods, chattels, rights, estate, credits and effects of the defendants in the hands of Charles Keen and Aaron Kille, executors of the last will and testament of Sarah Forde deceased, and summoned them as garnishees."

June 22d, 1833, *narr.* filed; and same day, on motion of *J. Miles*, for plaintiff, *judgment* for the plaintiff *sec. reg.*

Same *v.* Same. To September term 1833, No. 203. Writ of inquiry of damages. Return by sheriff that inquest, &c., assessed the damages of plaintiff at 11,573 dollars 39 cents.

The *scire facias* against the garnishees was,

"Shewell *v.* Keen and Kille, executors of Sarah Forde deceased, garnishees of Standish Forde and John B. Forde. To December term 1833, No. 116. *Scire facias* against garnishees. Return of sheriff—'*made known.*'"

March    , 1834, plaintiff files "interrogatories to be put to the defendants, garnishees, &c.

"1. Do you know the above named John B. Forde and Standish Forde? How long have you known them, or either of them?

"2. Had you, or either of you, on the 1st day of October, A. D. 1832, the date of the service of the foreign attachment in this case; or have you or either of you since that time had, in your possession, keeping, care, control, management or direction, any goods, wares, merchandize, moneys, property, credits, rights or effects of any kind or description, or any legacies, moneys, property or things devised, belonging, coming or appertaining to the said John B. Forde and Standish Forde, or either of them, or to which they are or were in any manner entitled, and which of them? If yea, state how much. Annex a proper account or exhibit to your answer hereto, and answer fully and at large.

"3. Had you, or either of you, on the said 1st of October, A. D. 1832, or have you or either of you since, as executors of Sarah Forde deceased, received or had possession of any property, moneys, effects or things, or had any control over the same, which, by virtue of the last will and testament of said Sarah Forde deceased, belonged to the said John B. Forde and Standish Forde, or either of them, and which of them, or to which they were in any manner entitled, or had any interest therein? Answer fully, and at large; and if affirmatively, annex statements or exhibits of amounts and facts in full.

"4. Are all the debts due by the estate of Sarah Forde deceased,

[Shewell v. Keen et al.]

of whose last will and testament you are the executors, fully paid and discharged? Has the general account of your administration of said estate been duly settled and confirmed? Annex copies of the same, and answer fully and at large.

" 5. Do you know of any other matter or thing material to the plaintiff in this case? Answer fully."

April 7th, 1834. The defendants' answers to the interrogatories filed in the above case by the plaintiff:

" 1. That they have been partially acquainted with John B. Forde and Standish Forde for several years, but the precise period they are unable to state.

" 2. That in their individual capacities they had not, nor had either of them, any, either on the 1st of October or since.

" 3. Yea, that they, *as executors* of Sarah Forde deceased, had, on the 1st day of October 1832, and since, the possession and control of the property and effects left by her, in which the said John B. Forde and Standish Forde were interested, they being each entitled under the will to one-sixth part of the residue and remainder of the estate, after the payment of debts and funeral expenses and certain legacies, two notes due by Standish Forde to the estate, amounting to 1406 dollars and 23 cents, with interest on them, to be deducted from Standish Forde's share. The statement annexed, marked A, shows the property belonging to said estate on hand on the 1st of January 1834, when distribution was made to the other legatees ; and the following property and effects were retained in their hands as executors as and for the shares of the said John B. Forde and Standish Forde, viz., a bond and mortgage given by Samuel Stevenson to the said executors for 1000 dollars, a bond and mortgage given by Adam Hoffman *to the said executors* for 400 dollars, seven shares of Commercial Bank stock, four shares of Farmers and Mechanics Bank stock, two shares of Mechanics Bank stock, and 1165 dollars 62 cents in money.

" 4. Yea, that all the debts due by the estate, so far as they have come to their knowledge, are paid and discharged. That their accounts as executors of said estate have been duly settled, and confirmed copies of said accounts are annexed, marked B.

" 5. That they know nothing further material to the plaintiff in this cause, except that in December 1832 they received from F. W. Hubbell, Esq., as attorney of Robert Sthreshley, a notice that the said John B. Forde did, on the 12th day of December 1832, assign

[Shewell v. Keen et al.]

all his interest in the estate of the said Sarah Forde to Robert B. Sthreshley."

*" Exhibits referred to in the Answers.*

## A.

Property on hand January 1st, 1834, belonging to the estate of Sarah Forde, attached, viz.

| | | |
|---|---:|---:|
| George K. Budd's bond and mortgage, | $2,500 00 | |
| Interest calculated to 1st of January, | 65 62 | |
| | | $2,565 62 |
| First Baptist Church's bond and mortgage, | 700 00 | |
| Interest to January 1st,      -      -      - | 22 75 | |
| | | 722 75 |
| Samuel Stevenson's bond and mortgage, | 1,000 00 | |
| Interest,   -    -    -    -    -    -    - | 13 32 | |
| | | 1,013 32 |
| Adam Hoffman's bond and mortgage,   - | 400 00 | |
| Interest,    -    -    -    -    -    - | 5 00 | |
| | | 405 00 |
| Seventy-five shares Commercial Bank Stock, valued at $62 50   -    -    -    -    -    -    -    - | | 4,687 50 |
| Forty-one shares Farmers and Mechanics Bank, at $64    -    -    -    -    -    -    -    -    - | | 2,624 00 |
| Fourteen shares Mechanics Bank, at $54   -    - | | 756 00 |
| Due to the estate from Standish Forde's notes, with interest, -    -    -    -    -    -    -    -    - | | 1,658 46 |
| William J. Hansell's account,    -    -    -    - | | 1,254 76 |
| B. P. Smith's account, -    -    -    -    -    - | | 682 87 |
| Ann Forde's account,   -    -    -    -    -    - | | 452 19 |
| Cash on hand,    -    -    -    -    -    -    - | | 2,003 19 |
| | | 18,825 66 |
| Deduct commissions,   -    -    -    -    -    - | | 693 97 |
| | | |
| Total valuation,   -    -    -    -    -    -    - | | 18,131 69 |
| Ann Forde's first legacy,    -    -    -    -    - | | 3,000 00 |
| | | 15,131 69 |

[Shewell v. Keen et al.]

Estimated value of each share, $2,521 94.

| | | |
|---|---|---|
| Estimated value of J. B. Forde's share, - - - | | $2,521 94 |
| Estimated value of Standish Forde's share, - - - - - - | $2,521 94 | |
| Less, amount of his notes, with interest, | 1,658 46 | |
| | | 863 48 |
| | | $3,385 42 |

The above is the total estimated value of Standish and J. B. Forde's shares on the 1st of January 1834.

B.

October 18th, 1833, Orphan's Court of Philadelphia. The account of C. Keen and A. Kille, executors of Sarah Forde deceased, was presented, and referred to auditors. The accountants charge themselves, *inter alia*, with the following items:

April 12th, 1833, sale of real estate by Wolbert:

| | | |
|---|---|---|
| A. Hoffman, - - - - - - - | | $1,200 00 |
| Samuel Stevenson, - - - - - - | | 1,750 00 |
| The following personal estate on hand: | | |
| Seventy-five shares of Commercial Bank stock at $70, | | 5,250 00 |
| Forty-one shares of Farmers and Mechanics Bank at $71, - - - - - - - - - | | 2,911 00 |
| Fourteen shares of Mechanics Bank at $59, - - | | 826 00 |
| G. K. Budd's bond and mortgage, principal and interest, - - - - - - - - - | | 2,516 67 |
| Baptist Church, do. - - - - - | | 709 22 |
| S. Stevenson, do. - - - - - | | 1,023 67 |
| A. Hoffman, do. - - - - - | | 613 70 |

The auditors reported the balance for distribution (including the above items) to be 18,801 dollars and 31 cents, which report was confirmed."

It appeared by this account that the executors, under the power in the will, had sold the real estate of the decedent, and had brought it into general account.

This case was argued at length by

*C. Ingersoll* and *Miles*, for the plaintiffs, and
*G. M. Wharton* and *F. W. Hubbell*, for defendants,

[Shewell v. Keen et al.]

Cited during the argument: acts of 1705, 28th of September 1789, 2d of March 1723, *Purd. Dig., tit. Attachment*; act of 21st of March 1772, *Purd. Dig., tit. Legacies*; *Petersd. Ab., tit. For. Attachment, and notes*; *Sergeant on Attachment* 86, 193; *Pris. Lond.* 267; M'Comb *v.* Duneh, 2 *Dall.* 73; Pringle *v.* Black's Executors, 2 *Dall.* 97; Bank of North America *v.* M'Call, 4 *Binn.* 372; Ross *v.* M'Kinney, 2 *Rawle* 227; Wike *v.* Lightner, 1 *Rawle* 289; *Rev. Laws N. Jersey* 50, *sect.* 3; Barnes *v.* Treat, 7 *Mass.* 271; Picquet *v.* Twan, 4 *Mason* 443, 463; Taylor *v.* Woodward, 4 *Halsted* 115; Thorn *v.* Wright, *Ibid., note*; Chamberlain *v.* Chamberlain, 1 *Ca. in Chan.* 256; Clark *v.* Herring, 5 *Binn.* 33; 2 *Watts* 61 *to* 65; Act of 22d of May 1722; 1 *Cowen's Rep.* 32; 2 *Bac. Ab.* 259; 1 *Rolle's Ab.* 551.

The opinion of the Court was delivered by

Stroud, J.—It not being stated that the executors assented at any time to the legacies bequeathed to the *defendants in the foreign attachment,* or that refunding bonds, in conformity with the requisitions of the act of assembly of the 21st of March 1772 "for the more easy recovery of legacies," have been tendered the executors, the broad question is presented, whether *without* such assent, and without the tender of a refunding bond, a legacy in the hands of executors is the subject of a foreign attachment under our laws.

It has long been settled that under the custom of London a legacy cannot be attached. Several reasons have been assigned for this exemption, the most prominent of which is, that a legacy cannot be recovered in a suit at law. This, of itself, is a *sufficient* answer *there.* With us this reason does not exist; and it is supposed, moreover, that our acts of assembly authorizing foreign attachment are of wider scope in respect to the subjects of attachment than the custom of London. Whether or not this supposition be well founded, it is needless to inquire, since it is obvious that our decision must be governed by the acts of assembly, and not by the custom of London.

The acts of assembly of 1705 and 1789 extend in *express* terms "to goods and chattels, moneys, credits and effects" of the defendant in the attachment; and *lands,* having always been regarded in this state liable for the payment of debt in the same manner as chattels are in England, have been deemed within the equity of these statutes.

Had the executor assented to the legacies, or, sufficient assets being admitted to be in his hands to pay them, had the legatees,

I.—Z

*prior* to the issuing of the attachment, tendered adequate refunding bonds, I should have inclined to the opinion that the attachments were well laid. In either of these cases the legatee would have had a legal right to the recovery of his legacy, in the first case, on the authority of Clark *v.* Herring, 5 *Binn.* 33, and in the second, by force of the act of assembly of 1772. " *Goods, chattels, credits and effects*" are words of large import according to numerous authorities, the chief of which are collected in Dowdel *v.* Hamm, 2 *Watts* 61 *to* 65. But at common law *without* the assent of the executor, and by our acts of assembly *without* the tender of a refunding bond, the legatee has clearly no right which he can enforce, and I am unable to see how his creditor can be in a better situation. The exaction of a refunding bond is for the protection of *creditors of the testator*, whose rights are altogether superior to any claim which the *creditors of the legatee* may be supposed to have. Take the case at common law, without regard to our act of assembly, and in what light is a legatee to be viewed, having respect to his *legal* rights under the will? Upon the death of the testator, the whole of his personal estate, the proper fund for the payment of legacies is, *eo instante*, by *act of law*, transferred to his executor. He takes it in trust, *primarily* for the payment of the testator's debts. Until these are *wholly* discharged, it would be a violation of *duty* in the executor to make the slightest application of the funds of the estate to a legatee as such, or to suffer him to appropriate to his own use any portion of the goods left by the testator, although the subject of a *specific* bequest to him. Even a debt due *to* the testator at his death, but released or forgiven by his will, is still looked upon as *assets* in the event of a deficiency of other estate of the testator to satisfy his debts. Sibthorp *v.* Morton, 1 *Ves. Sen.* 50. And the *assent* of the executor is necessary to consummate the intention of the testator, however fully declared in this respect. 1 *Roper* 565, 566. This doctrine, in its whole scope, rests upon the sound principle that a debt due by the testator is a right in his creditor of the highest legal efficacy; while a legacy is a mere benevolence in its creation, and can never attain, comparatively, a more obligatory character. This is the very reason assigned by lord keeper Finch in Chamberlain *v.* Chamberlain, 1 *Cha. Cas.* 256, why a legacy is not the subject of foreign attachment by the custom of London. " The legacies," he says, " are not due till the debts be paid, *and a legacy being paid, remains as a legacy in the hands of a legatee after payment,* and hence it is that

[Shewell v. Keen et al.]

a legacy is not attachable by foreign attachment, as it may work a wrong to the creditors, who are third persons, and have no day in court in that suit to interplead." In Connecticut, Massachusetts and New Jersey, concurrent decisions have taken place on laws, so far as the present inquiry is concerned, precisely like our attachment acts, negativing the right to attach a legacy in the hands of the executor. Winchell v. Allen, 1 *Conn. Rep.* 385; Barnes v. Treat, 7 *Mass. Rep.* 271; Picquet v. Swan, 4 *Mason's Rep.* 443, 463; Taylor and others, Executors v. Woodward, 4 *Halsted's Rep.* 115, and Thorn v. Wright, *Ibid., note.*

The decision in New Jersey is entitled to great respect, from the character of the court by which it was pronounced; especially so, as the law of that state for the recovery of legacies is almost literally identical with our act. It bears date about two years later, and its very title, as well as the *whole* of its provisions, show that if not borrowed from ours, both must have had a common original. See *Revised Laws of New Jersey of* 1821, *page* 50. The same point has been decided there *twice.* On the first occasion, Ewing, C. J., was not present, and the opinion was delivered by Ford, J., who disposed of the question in this manner. " A legacy is not a *right* at common law. It may be reduced to a *right* by the legatee, if he pursue the provisions of the statute. *Revised Laws* 50, *sect.* 3. The right does not vest until the bond has been offered or filed. There is no provision in the *attachment* act requiring the attaching creditor to give such bond. How then is the executor to obtain the indemnity the refunding bond was intended to afford?" Thorn v. Wright, 4 *Hals. Rep.* 115, *note.* This reasoning applies with precisely the same force in regard to our laws; for the attachment law of New Jersey is, to say the least, as comprehensive in its terms as our acts of 1705 and 1789 combined.

In Barnes v. Treat, the supreme court of Massachusetts denied the right to attach a pecuniary legacy, on the ground that in the hands of the executor it could not be regarded as " *goods, credits or effects.*" " Pecuniary legacies," it was said, " in the hands of the executor, are not ' *goods or effects,*' and it is equally clear that in no proper sense can they be denominated *credits.* Without the relation of a *creditor* and a *debtor*, there can be no such thing as a *credit*; but a legatee can, in no proper sense, be said to be the creditor of a testator; nor a testator, merely as such, the debtor of a legatee." Judge Story gives his full sanction to this doctrine in Picquet v. Swan,

[Shewell v. Keen et al.]

before cited. The language of the Massachusetts decision is, that "a *testator* is not the *debtor* of a *legatee.*" It is scarcely necessary to add, that the *executor*, although he may have sufficient assets in his hands to pay legacies, is not, in legal contemplation, the *debtor* of the *legatee*, before assent given to the legacy, or a refunding bond tendered. If he were, *indebitatus assumpsit* would lie against him, which cannot be pretended without a total disregard of the settled doctrine on the subject, both in England and in this country.

The views of the supreme court of Connecticut accord generally with those expressed in the Massachusetts reports, with the further suggestion of a conflict of jurisdiction with the court of probate—the proper tribunal for the settlement of executors' accounts.

The obstacle from the *want* of *a refunding bond,* is attempted to be surmounted by the suggestion that *this* court may, before execution is awarded against the garnishee, coerce *the plaintiff* to give security to him, similar in character to that which is directed by the act of 1772 to be provided by the *legatee.* It is a sufficient answer to this, that the executor has assumed his office in reference to a state of the law not merely not identical with this proposition, but which he has a right to say is wiser and better. He has a right to say that a *reasonable* demand of payment of the legacy, and a convenient opportunity of ascertaining the value of the surety that is offered for a return of the legacy, if circumstances should render that necessary, formed part of the terms on which he assumed his office, and that he ought not to be deprived of these because a *stranger* has chosen to intermeddle in his affairs. And should it be replied, that the decree of the court will constitute a protection to him from the claims of creditors, whether the security be adequate or not, the objection to the course proposed is rather strengthened that weakened, because the *substantial* ground for requiring the refunding bond is the security of *creditors* of the testator, and they are not before the court. Courts, without doubt, interpose occasionally, and exact indemnification before they enforce a proceeding, in itself proper, but which in its operation may prejudice the interests of third persons. But this interference takes place only in cases manifestly beneficial to the party *for* whom it is exercised, and never in derogation of the rights of individuals not before the court, and otherwise amply protected.

It would have been much more advantageous to the parties, and more satisfactory to us, if the investigation of this question had devolved upon the court of the last resort. It appears to have been

[Shewell v. Keen et al.]

incidentally before it on several occasions, but not being the very point in the cause, no decision has taken place. I speak of *reported* decisions, for I can scarcely doubt, that in the long tract of time which has elapsed since the passing of the first attachment law, some pointed intimation in denial of the pretension upon which this attachment is founded, has been given from the bench. Certain it is, that until Ross *v.* M'Kinney, 2 *Rawle* 227, the sentiment of the profession in this city, was as settled on this point as on any acknowledged principle of the common law.

This case having been commenced in October 1832, is to be determined by the laws then in force. Looking at the provisions of the " act relating to executors and administrators," passed the 24th of February 1834, which must govern all future cases, no room for conjecture or experiment is left. Security is there directed to be given *in the orphan's court,* and there only; and therefore the injunction of the 13th section of " the act to regulate arbitrations," of the 21st of March 1806, will apply with despotic effect. Wike *v.* Lightner, 1 *Rawle* 289, 290. In coming to the conclusion that this attachment cannot be supported, I have not lost sight of the admitted principle of our jurisprudence, which sustains actions founded on rights purely equitable and without the pale of a mere common law forum. This doctrine rests on *necessity,* to prevent the reproach and injustice of an existing right without a corresponding remedy. The present application is not of this description. The creditor has all the usual remedies against his debtor; and they are ample. If more is desired, let the legislature be applied to, according to the suggestion of the court, in Ammant *v.* The New Alexandria Turnpike Company, 13 *Serg. & Rawle* 210. With equal propriety might a sequestration of tolls have been awarded there, as the attachment here be enforced.

JONES, J.—I concur in the opinion that a legacy not due and payable is not liable to attachment in the hands of an executor previously to his assent to it. In corroboration of the argument founded upon the authority of adjudged cases, it may be observed that the act for the more easy recovery of legacies, was first passed on the 3d of February 1742, which was thirty-seven years after the passage of the act about attachments. We must suppose that the legislature in 1705 intended that the provisions of the act about attachments should be in harmony with the law in other respects. But in 1705,

[Shewell v. Keen et al.]

the remedies for the recovery of legacies were the same in Pennsylvania as in England; and the mode of proceeding depended upon the fact, whether the executor had assented to the legacy or not. If the executor had assented, the legatee became possessed in his own right—the interest in the chattel was vested in him, and was governable by the rules of the common law. This was decided in Bastard *v.* Stukely, 2 *Levinz* 209 ; S. C., *Thomas Jones's Rep.* 130 (29 *Car.* 2, A. D. 1676). The same principle was decided in Young *v.* Holmes, 1 *Strange* 70 (4 *Geo.* 1, A. D. 1768). It had also been decided previously in Paramour *v.* Yardley, *Plowd.* 539 (21 *Eliz.* 1579) ; 4 *Co. Rep.* 28, *b* ; Guy *v.* Doe, 3 *East* 120. This then was the settled law of England at the date of the act of 1705 about attachments, and was doubtless well known by the legislature which passed it.

But there was no remedy at law, either in England or in Pennsylvania, for the recovery of a legacy without the assent of the executor. The reason is, the legatee had no property in the thing bequeathed. It was not " his money, goods, chattels or effects," and therefore not the subject of any action founded upon the right of property. *Thomas Jones's Rep.* 130 ; *Vaughan* 96, 97, 101. The remedy was in chancery.

There is reason to believe that the courts of Pennsylvania, from the settlement of the province till 1736, with the exception perhaps of some short intervals, exercised chancery powers. Not to insist upon the 5th and 6th articles of the charter to William Penn, the law about monthly courts, (passed 36 *Car.* 2, A. D. 1684) one of the earliest acts of provincial legislation, provided " that every court of quarter sessions should be as well a court of equity as law, concerning any judgment given in cases by law capable of trial, in the respective county sessions and courts."

That these courts of quarter sessions had jurisdiction of civil pleas is evident from the act passed soon after, requiring the constitution of appraisers of goods taken in execution. They are also described in that act as county courts or sessions. (See 1 *Votes of Assembly* 25, 26, where these acts are referred to.) From the settlement of Pennsylvania till 1710, the powers of the courts, there is reason to believe, were not materially altered. 3 *Votes of Assembly* 506 ; 1 *Votes of Assembly* 136, 137 ; 2 *Votes of Assembly* 77.

In 1710 an act was passed establishing courts of judicature, by which a court of equity was established. (*Laws, edit. of* 1714, *p.* 99.)

[Shewell v. Keen et al.]

This act is said to have continued in force until 1719. 1 *Dall. Rep.* 511, *edit. by Mr Wharton.* But it appears that it was repealed on the 20th of February 1713; 1 *Miller's edit. of Laws* 46, 51, 52; and another act was passed on the 28th of May 1715 for erecting a supreme or provincial court of law and equity, which was also repealed on the 21st of July 1719. 1 *Miller's edit. of Laws* 62, 74. In 1720 Governor Keith established a court of chancery, which continued till 1736, and was then suppressed. 1 *Dall.* 512, *edit. by Mr Wharton;* 3 *Votes of Assembly* 256, 257, 258, 268, 269, 274. On the 3d of February 1742 the act for the more easy recovery of legacies was passed for the first time.

It thus appears that there was a chancery forum in Pennsylvania during almost the whole interval between its settlement and the passing of the act of 1742, to which application could be made for the recovery of legacies not vested in the legatee by the executor's assent.

Bearing these facts in mind, the peculiar significancy of certain expressions in this act will be more obvious. The act is entitled " an act for the *more easy* recovery of legacies," &c. It recites that " the laws of this province relating to the recovery of legacies *are defective.*" Neither the title nor this recital was true in respect of legacies to which the executor had assented. In those cases the remedy at law was ample, and *more easy* than the method provided by the act. In fact the legatee is required by the act to do many things which he might dispense with in an action founded on the assent of the executor. He must make a reasonable demand before suit brought—tender security with two sufficient sureties to refund the legacy, if any part or the whole of it should afterwards appear to be wanting for the payment of debts. If the executor refuses to accept the security, he must file it with the clerk. The legatee must aver in his declaration that the assets of the testator are sufficient to pay his debts and the legacies. Upon the plea of a want of assets, the proceeding must be suspended till the accounts of the executor can be examined by auditors, and finally, if the time for the payment of the legacy is not fixed by the will, no action can be maintained till after a year has elapsed from the death of the testator.

This course of proceeding may be deemed *easy* in respect to proceedings in chancery, but not *more easy* than an action at law in

[Shewell v. Keen et al.]

which the legatee was bound to prove only the bequest and the executor's assent.

Again, the clause in the 1st section, giving jurisdiction to *any* of the *county* courts for holding pleas in *any* of the counties, conveys an allusion to the defect intended to be remedied, viz. a defect of jurisdiction consequent upon the suppression of the court of chancery in 1736, and the previous repeal of the acts giving jurisdiction in chancery to the common law courts. The court of chancery was an extraordinary court held only in *one* of the counties. 3 *Votes of Assembly* 256, 273, 275.

It may be observed too, that the clause in this act of 1742, relative to the refunding bond, was adopted from the practice in chancery; Chamberlain *v.* Chamberlain, *Ca. in Chan.* 257 (1674); a practice since disused in England, but then in vogue, and doubtless well known by the legislature of Pennsylvania. 1 *Williams on Executors* 824, 893. The practice of appointing auditors upon a plea of the want of assets, came in lieu of a reference to a master in chancery.

Looking then to the state of the law for the recovery of legacies previously to 1742, and to the phraseology and provisions of the act for the more easy recovery of legacies, it is obvious that without the assent of the executor the legatee was deemed to have merely an equitable claim to the thing bequeathed, and not a legal interest or property in it which could properly be denominated or described by the words, " the money, goods, chattels or effects" of the legatee. For if it were such, the claim to it might have been enforced by a common law action in a common law court. If this be so, can we suppose that the legislature of 1705 intended to comprise such legacies within the operation of the act about attachments?

But an important inference is deducible from this state of the remedial law.

The act of 1742 is, in fact, an act conferring a jurisdiction upon the common law courts, which they did not possess by virtue of the act of the 22d of May 1722. It will be observed that this act of 1722 was passed while there was in fact a court of chancery in Pennsylvania, and it certainly was not supposed to give the common law courts jurisdiction or power to compel the payment of legacies, where the assent of the executor had not been given. If it did confer that power, then the act of the 3d of February 1742 was not necessary. If it did not, then the act of the 3d of February 1742 is an act conferring a new power and jurisdiction.

[Shewell v. Keen et al.]

Now it is a rule that where a new power or jurisdiction is given, and the mode of exercising it is prescribed, the directions of the act must be pursued; and this rule is applicable to superior courts, as well as to inferior magistrates. The reason is obvious: no court can exercise attributes which it does not possess.

The question now occurs, whether the executor is amenable to answer in any court of common law, except in one of the forms of action mentioned in the act of 1772, which is in fact the act of 1742 made perpetual.

It must be borne in mind that the effect of this act is not to *vest* in the legatee a *legal* interest in the thing bequeathed; that remains in the executor as it was before; but the act merely gives a qualified jurisdiction to the courts of common law in a matter previously cognizable only in equity.

Upon this point the argument is very brief. It has been proven that there is no action at law applicable to this case, nor any common law jurisdiction which can take cognizance of it. The act of the 21st of March 1772 is the only source of authority for the courts, and the indispensable foundation of any action at law. The courts, therefore, can give no effect to any action or proceeding not mentioned in the act. They have as much power to entertain a bill in equity as to compel the executors to interplead with the plaintiffs in this form of proceeding.

This is not an action against the executors. The action is against Standish Forde and John B. Forde. The executors came into court upon a *scire facias quare executionem non;* which is in fact only parcel of the execution. 1 *Cow. Rep.* 32. The executors may plead *nulla bona* in answer to this writ. If the plaintiffs should reply that they hold the legacy attached, they may demur or rejoin the act of the 21st of March 1772, and deny the jurisdiction of the court; it would then be incumbent upon the plaintiff, at least to show the assent of the executors to the legacy, in order to give the court jurisdiction in this proceeding.

It is scarcely necessary to add any thing to the considerations suggested; but they may be inferred by adverting to the details of the act of the 21st of March 1772. In the first place, the executors are not amenable to the jurisdiction of the common law courts, unless they neglect or refuse to give their assent to the legacy after a reasonable demand made upon them. The act is express: no such suit shall be maintained "for any such legacy until a reasonable

demand made, &c. of the executor, &c., who ought to pay the same, &c."

Now this implies that although the executors are not compellable to pay without demand before suit brought, yet they *may avoid* a suit by payment on demand : but by the law of this action, though the attaching creditor should demand the legacy before suit brought, or before the *scire facias* issued, yet the executors cannot pay, except at their peril, before the award of execution ; that is, the law requires the one party to demand the payment, and the other to refuse it. The incongruity shows that such legacies were not deemed to be within the operation of the act of 1705.

The act also expressly provides, that " no such suit shall be maintained, &c. until an offer made of two sufficient sureties, &c., who shall become bound in double the sum, with condition to refund," &c. This is a provision intended for the protection of the creditors of the testator. *Ca. in Chan.* 257. The executors not only *may* insist upon this, but they *must* insist upon it at their peril. It would be a *devastavit* in them to suffer a recovery where this prerequisite should be omitted. The qualified or limited jurisdiction of the court would not protect them.

But when is this refunding bond to be tendered ? The words of the act are, "before *such* suit brought for the legacy." Here no *such* suit has been brought ; and the plaintiff has filed no refunding bond : yet he does not appear to me to have prejudiced his case by the omission. The bond is connected with the actions mentioned, and therefore required in no others. But the just inference is, not that the bond may be dispensed with, but that the legacy cannot be recovered from the executors except by one of the actions mentioned in the act.

Suppose, however, that the attaching creditor gives the refunding bond and receives the legacy, is his judgment satisfied ? Can he be compelled to enter satisfaction under the act of the 3d of April 1791, sect. 14 ? Suppose he should be compelled to refund the legacy, Can he issue a new execution and levy it upon other effects not attached ? Or can he commence a new action upon the original cause ? Or must he lose his debt ? Or suppose the legacy is specific and taken in execution ; or suppose the proper goods and chattels of the executors to be taken in execution ; is the purchaser to give the security, and thus get a defeasible interest in the chattels sold ? Neither of the acts relating to attachment, nor that relating to the recovery of legacies contemplated any such emergencies. No provision is made for them. On the contrary, it is evident from the

[Shewell v. Keen et al.]

act of 1705, sect. 4, that after a year and a day from the award of execution the judgment and the satisfaction are indefeasible, except upon a writ of error, which must be brought within seven years, while there is no limitation of the liability on the refunding bond. It is obvious, therefore, that nothing is liable to the process of attachment which cannot be absolutely applied by execution in satisfaction of the plaintiff's demand.

Again, the executors may insist that the plaintiff shall not substitute interrogations for the plea of the want of assets, and subject them to the proceedings allowed by the act of the 28th of September 1789, instead of the proceeding before auditors allowed by the act of the 21st of March 1772, sect. 3. And how could this be managed upon the *scire facias?* Both are statutory proceedings. The one provides that upon the plea of the want of assets the court shall appoint auditors to settle the accounts of the executors, whereas the other would allow the plaintiff to refer the accounts to a jury, if the executors do not settle them by their answers to the interrogatories in a manner satisfactory to him.

Other difficulties might be suggested. An argument also might be constructed upon the operation of the writ of attachment. The writ is process merely for the commencement of an action. Its effect, in the first instance, is to warn the defendant of the plaintiff's suit. It operates by sequestering his effects from his control, and is therefore deemed the means of conveying actual notice to him. Obviously, therefore, it cannot have that effect, except when it is executed upon his money, goods, chattels or effects, in the proper sense of those words, that is, upon his property or legal rights actually vested, and at least constructively under his control. It has been shown that such is not the right of a legatee to a bequest, before the executor's assent. The law does not presume that a legatee, in such case, would attempt the exercise of any such act of ownership over the legacy as would be the means of notice to him, because it would be an invasion of the executor's right, and a trespass.

I am of opinion therefore that upon principle, as well as authority, the attachment issued in this case is inoperative as it respects the personalty bequeathed by Mrs Forde to the defendants.

PETTIT, *President*, was absent at the argument of this case, in consequence of indisposition.

Judgment for defendants.